Plumbers, Pipefitters, and MES Local 392 Fringe Benefit funds as well as the Plumbers, Pipefitters, and MES Local Union 392. I've asked to reserve three minutes for rebuttal argument. That's fine, and you may proceed. Your Honors, this case boils down to the issue of what's required in the Sixth Circuit to demonstrate an employer's assent to the fringe benefit contribution provisions in an unsigned collective bargaining agreement. We believe that the district court erred in this case when it found that B and B did not assent to those provisions in the collective bargaining agreement. Based upon multiple signed declarations that the employer did sign that referenced and incorporated those terms in the collective bargaining agreement, one of which was a signed bond agreement, which is only a requirement of the collective bargaining agreement. And that agreement very clearly provides that B and B agreed to be bound by the collective bargaining agreement and pay contractually agreed amounts to the fringe benefit funds. Now, that's just one example of the many instances where B and B showed its intent to be bound by the collective bargaining agreement in this case. In addition to the multiple signed agreements that referenced and incorporated the terms of the collective bargaining agreement, we have 10 years' worth of employer conduct in this case that was entirely compliant and consistent with the terms of the collective bargaining agreement during that period. Now, despite this mountain of consistent conduct on the part of the appellee, the district court determined that a signed collective bargaining agreement was necessary to demonstrate their assent to be bound by those terms. Not only does the district court's decision disregard the reality of B and B's relationship with the fringe benefit funds in the union over a 10-year period, we believe it imposes a legal hurdle that does not exist under Section 302 of the LMRA. I do have one. I'm sorry. Go ahead. Just in light of that comment, can you shed some light on B and B's relationship with the MCA prior to 2009? No, I can't, Judge. I don't believe they became a member. At least it wasn't in the record before the district court whether or not they were a member prior to 2009. My understanding is they did become a member of the Employer Association in 2009. And some sort of relationship as B and B Plumbing? Is that correct? I don't know if they had a relationship with the Employer Association as B and B Plumbing. They started out in 2002 as B and B Plumbing, at some point affected a corporate name change and became B and B Mechanical. So at a minimum, I would submit to the court that they were bound to the collective bargaining agreement negotiated between the association and the union subsequent to 2009. But they clearly, from 2002 to 2009, acted consistent with being an employer that was bound to the agreement between the Employer Association and the union during that time as well. So is part of your argument that the MCA had apparent authority to negotiate on behalf of B and B? I know you referenced to these 10 years of sort of the course of conduct. And the parties acknowledged that MCA or B and B never gave written consent or assent to MCA to bargain on its behalf. So is part of the argument here that MCA had authority or apparent authority, or is that not an issue at all? No, that is part of the argument, Your Honor. Jack Bertoli, the executive president for the MCA, testified that he has a lot of employers that don't sign that letter of assent form that the MCA sends out. But nonetheless, these employers act consistent, like B and B did, with being bound to the collective bargaining agreement. So the MCA has taken the position that this is just how the paperwork trail goes, I guess, between the MCA and its employers. And they have a lot of employers that don't return that signed paperwork. Yet, nonetheless, act consistent with being bound to the agreement negotiated between the association and the union. And, in fact, here, the district court cites to the language in Merriman where the Sixth Circuit says the decline to hold an employer is going to be bound to make pension contributions when it never signed its assent to a CBA and voluntarily contributed for a period of time. There's no evidence in this case at all that these contributions were voluntary. In fact, there's no evidence at all of B and B's purported intent not to be bound to the CBA. All we have here is evidence for the opposite that indicates its assent to be bound to the CBA over a 10-year period. Don't you have one of the owners who's testified that it was his intent that B and B not be bound to the CBA? Yes, the first time this assertion that they weren't bound to the CBA was made was in the context of late in the litigation before the district court, and it appeared in an affidavit of, I believe, Brian Kenney, one of the owners, indicating that he never intended to be bound to the CBA. Well, we don't believe that's the case, but even assuming for a second, for sake of argument, that he never intended to be bound, these contributions are illegal under Section 302. They're either pursuant to a written agreement and therefore legal or not pursuant to a written agreement under 302 and therefore illegal. Now, we don't believe they were illegal because we believe, as we've argued in our brief, that B and B intended to be bound to the collective bargaining agreement. Therefore, we don't believe there was any illegality here, but this is the exact reason courts have found employers liable to collective bargaining agreements based on their conduct, so the contributions aren't deemed illegal. Well, let's say that constitutes some evidence that B and B did not intend to be bound, and the lack of a signature constitutes some evidence. Wouldn't, at a minimum, there be a fact question about the intent? There may be, Your Honor. We don't feel there was because we don't feel that the absence of a signed agreement from over 13 years ago is evidence of much of anything other than maybe sloppy triggers. Well, it's not just an absence of a signed agreement from 13 years ago. It's the absence of a signed agreement ever. Yes, and we believe that the stronger evidence is to look to the employer's own record. Well, I know, but we don't, I mean, whether the district court was right or not, we would not engage in a weighing exercise at this point in the litigation. We're not, I mean, no court at this point would be determining what the stronger evidence was. Isn't that correct? Your Honor, if... That's a simple, pretty simple question. I mean, that's not what you do in summary judgment, is it? No, but we believe the court committed clear error in applying the wrong standard here. They just got the outcome wrong. Because if employer conduct isn't enough in this case... Well, if they got it, if the district court got it wrong, there are two possible outcomes. I mean, you could enter summary judgment for the other side, or you could say there's a fact question, right? That's correct. We believe the entry of summary judgment obviously was in favor of B&B was incorrect as a matter of law. Your argument, the argument that you're presenting now has to do with a conduct question, and you've asked that we look strictly to conduct, but it seems that there are two options here that we see in the different circuits. One is whether there are sufficient signed contracts to constitute the written agreement in compliance with the LMRA, independent of conduct, simple contract question. Or you could say, as some circuits have, we'll look at the conduct and we'll decide whether there was sufficient conduct. My understanding of your briefing is that you're arguing both. You would suggest that either there are sufficient contracts or the conduct is such that we ought to hold, that there's no dispute of fact that they conducted themselves and intended to be bound. What are the documents that you rely upon if you are taking the arm of a contractual obligation? Well, Your Honor, you correctly summarized the argument in our brief. Obviously, we're arguing an alternative that conduct alone can exclusively bind and deploy, like the Seventh Circuit's decided in the ban on restoration case, we believe that's the better rule because it creates a bright-line standard for these types of cases. But alternatively, to answer your question about the contracts. Let me ask you about that. It does create a bright-line rule, but isn't that somewhat at variance with what ERISA Section 515 is trying to do to prevent long disputes and the slowing down of the collection process? I'm struggling with this because it seems to me that the bright-line rule, did you sign a document that constitutes the written agreement under the LMRA or didn't you, might be a much cleaner way to do it. Is that not part of the issue of collection of fringe benefits is the expeditiousness? Sure, absolutely it is, Your Honor. And obviously, if you can decide the contract question without getting into a factual analysis of the employer's conduct, that would be the cleaner, more expeditious route to go. I agree with the Court. Here we have 10 years' worth of contributions and signed declarations on the contribution reports themselves that reference the collective bargaining agreement and why B&B was paying contributions into the funds. That's approximately 120 signed contribution reports that this employer signed and submitted to the funds in this case. By the way, the correct contribution rates is they changed from collective bargaining agreement to collective bargaining agreement over that 10-year period. In addition, what we feel is the strongest agreement is the bond agreement because that explicitly references the fact that B&B agrees to be bound to that collective bargaining agreement and, more specifically, the fringe benefit fund provisions and contribute paid contractually agreed amounts to the fringe benefit funds is the exact language in the bond agreement. When that agreement, I'm sorry, when they changed their corporate name, they executed a rider to that agreement. They sent it on to the union and said, you know, FYI, we changed our corporate name, but we're still in compliance with the bond provision of the collective bargaining agreement. In addition, and perhaps most tellingly, they participated in what's called the Equality and Stabilization Program, and what that is is it's a union program run, administered jointly with the Contractors Association, and it provides union money. It's funded by all union money to signatory contractors to target certain jobs to effectively compete against non-signatories. They applied for that money four separate times and signed four memorandums of understanding with the MCA, the Employer Association, and the union to receive that money, and they did, in fact, receive that money. If they didn't believe they were signatory to the collective bargaining agreement, why are they applying for union subsidies to compete with non-union contractors? It doesn't make any sense. The answer, we believe, is clear because their intent, along with applying for that money, was consistent throughout their participation with the funds. They believed they were a union contractor, and they acted in accordance with the collective bargaining agreement. There's no inconsistent conduct here whatsoever. In every other case, there's some employer conduct outside of a self-serving affidavit where the employer indicated its intent in the other direction not to be bound. I would ask to reserve the other three minutes of my time for rebuttal. Thank you. Thank you, Counsel. Good morning, Your Honors. May it please the Court, my name is Curtis Cornett. I represent B&B Mechanical, the appellee in this matter. What's the most relevant aspect of a party's intent to enter into an agreement? Isn't it whether they actually sign the contract or they give a third party the authority, they delegate that authority to sign it on their behalf, both of which B&B had the opportunity to do here and both of which the undisputed evidence shows they refused to do? They never signed the CBA. Doesn't the Sixth Circuit law heading all the way back to the 1980s, beginning with Binky and going forward from there, clearly say that the written agreement required by Section 186 need not be a collective bargaining agreement? There has to be a writing signed by the employer. And that's all? It does not have to be the collective bargaining agreement? Isn't that correct under our precedent? That manifests the employer's assent to be bound. I think that is the Sixth Circuit precedent, Your Honor. So a written agreement? Yes. But not necessarily signatory to the collective bargaining agreement? No question about it. I mean, in Herb Phillips and O.G. Kelly, the employer delegated that authority to a third party. In this instance, that would be the MCA. And the Sixth Circuit held, this Court held, that, yeah, the employer doesn't technically literally have to sign the CBA. They can have someone sign it on their behalf, or they can delegate the authority to enter into these type of agreements to a third party. But the failure to sign is some evidence of intent. I'm sorry? The failure to sign or the refusal to sign would be some evidence of intent. In fact, it's the most legal relevant consideration, especially given the terms of the collective bargaining agreement, which says that if B&B, the contract, the CBA, that was attached to the complaint in this matter, absolutely says that this contract to be assented to by the contractor, this agreement says in Article I, Section 3, that the contract shall be made available for adoption to the contractor who shall evidence his intentions in this regard, that is, to be bound by the CBA, by executing a copy of this agreement with the union. That's what the contract language says. It's not an issue of fact whether or not that ever happened. But who is the party to the contract in this situation? It's not the individual contractor. It's the mechanical contractor's association. This was an association-bargained agreement, was it not? And the preamble says that in the collective bargaining agreement, doesn't it? It does, and it provides for the opportunity for a contractor that's part of the MCA, that joins the MCA after this agreement has been negotiated by the MCA, just like what happened here when B&B joined MCA in 2009. This agreement was already in effect. This contract contemplates what would happen in that case. If the contractor wants to be bound, it has to sign it. That's what the language says. So, yes, I agree. The agreement is between the MCA and the union, yes. And if a contractor joins the MCA after this agreement's in effect, then you look at Article I, Section 3, to determine whether the contractor is bound. And that didn't happen here. We didn't sign it. So that's just contract law. That's not Section 302. That's not ERISA. That's contract law. And as I understand this court, you don't throw contract law out the window when you're interpreting these things. So I don't think there's a question of fact here as to whether or not B&B ever assented, especially given the fact that we know, as another undisputed fact, that the MCA actually reached out to B&B and said, hey, we don't have the authority to bind you without this written authorization. Please sign this and return it to us. We didn't sign it, and we didn't return it to the MCA because we didn't want them to bargain on our behalf. Help me understand, then, why you entered a bond agreement with an insurance company with the bond agreement only being required in the collective bargaining agreement. Simple answer. The union required us to do that. I mean, these things that manifested the employer's intent are things required by the union, right? The union fills out the certification forms and says, you fill in the amount of hours these employees worked, and that's what the undisputed evidence shows we did. So we signed them. Yes. Is B&B the most sophisticated commercial entity in the world? No, it's not.  So why did they sign a bond agreement? It's against the law to make a contribution to a trust fund if you are not signatory or in a written agreement that evidences the proper parties and the proper payments. And both parties would be equally culpable in this case. The union doesn't have clean hands either. If, in fact, Mr. Mallon's right and these contributions were, quote, illegal, would the union absolutely contribute to that situation? No, it's not only the payor, it's the recipient. Right. And, in fact, isn't that why we're here today? I mean, Mr. Mallon keeps saying that we were fully assentee and, of course, we wanted to be bound, but the reason why we got sued is because we weren't withholding the proper amount of contributions. In fact, Mr. Williams and Mr. Kinney never sent in contributions for themselves because they never thought it was appropriate. So that's why we're here is that we didn't, quote, follow the terms of the CBA and we got sued. So there's not evidence that we were just absolutely compliant in following all the terms of the CBA. In fact, again, the evidence shows the reason we did this is because the union thought it was appropriate for us to do this. We did it. And the owners of B&B used to be union members and they thought it was appropriate to make contributions on behalf of their union members. There's no evidence at all here that this is a more traditional situation where you're having, you know, bargaining between the union and the employer. The only relationship really at all was these contributions that Mr. Kinney and Mr. Williams felt were appropriate to send in for benefits on behalf of their union members. What about the equality and the E&S fund? What about it? Yeah, what about it? They entered a participation agreement with the E&S fund that says that this is a program to help signatory contractors and that the conditions must be followed by all eligible signatory contractors and then the Memorandums of Understanding 4 signed for the purpose of obtaining money from the union that is provided to signatory contractors so they can compete with non-union contractors, non-signatory contractors. And you have four over 2008 to 2011 B&B applied for and took money in order to compete with non-signatory contractors. And that says this Memorandum of Understanding is applicable to the job name and location stated because it changes the wages in the collective bargaining agreement, but the agreement shall remain in full force and effect in accordance with its terms. And all four of those are signed by Brian Kinney. How is that not a written document that evidences agreement and assent to the terms of a collective bargaining agreement? Because Article 1, Section 1 of the agreement says it doesn't seek to impose the terms of the collective bargaining agreement on non-signatory contractors. Because you can't get it if you're a non-signatory contractor. Of course it doesn't apply to non-signatory contractors because it's union money. That's what the participation agreement says. It does not apply. Non-signatory contractors don't get it. I don't understand the argument that that means you can be a non-signatory contractor and take union money. That's not what the participation agreement says. I'm sorry. I don't understand the question. We know there's not, we know that BME wasn't a signatory. We know that. We don't have to say that. We know that they are signatory to a participation agreement that says I'm a signatory contractor. We know that the Memorandum of Understanding for the money they took over those four years says the contract to which I, let me get the exact language, this Memorandum of Understanding says that the agreement of June 2006 shall remain in full force and effect in accordance with its terms. And that's signed by Mr. Kinney. I'm at a loss to understand how that agreement is not an assent to the collective bargaining agreement terms. I can only reiterate what I... Well, tell me what your position is. Because ERISA and the LMRA say you don't have to have a signed collective bargaining agreement. Herb Phillips says you can be an agent without written agency. O.G. Kelly says there's a purpose here. The purpose is so you may legally make contributions to a plan. And if you don't, then you have other Section 186 problems. Because I understand you think it's an equal issue, but it's a felony for your client, punishable by a $15,000 fine and less than five years in prison. So, I mean, there's a serious reason that the LMRA is seeking to require that there be a written agreement for these contributions. So I'm struggling with why you've got ten years of contributions, you have a bond agreement that says, I have entered into a certain written contract of employment or signed a letter of assent. And that is signed by Mr. Kinney. I don't understand the argument that 120 participation agreements, I mean 120 remittance agreements over ten years with a certification on the national one and a declaration on the local one, a bond agreement that's only required in the CBA that says I'm in a written agreement and an E&S agreement that takes money only provided to signatory contractors doesn't show that you have signed documents that have bound you to a written agreement so that you could legally make the payments that you've been making for ten years. If the court wants to make an estoppel argument, I guess I understand that. But if you're saying the bond agreement somehow incorporates the CBA, that the bond agreement is an agreement to be bound by the terms of the CBA, I do not understand that argument. I'm struggling with that too because, first of all, I don't even understand why you would execute a bond agreement, sign your name authorizing a bond agreement unless you want to make contributions. And then the bond agreement says the principal, which is your client, has entered into a certain written agreement of employment or signed a letter of assent to be bound by the terms of the agreement. And then it says it, between the Mechanical Contractors Association and Pipefitters Local 392. How much clearer can you be that you have accepted in a written agreement the terms of the collective bargaining agreement for purposes of making those payments legal under Section 186? Well, one thing you could do is sign the collective bargaining agreement. Another thing you could do is have the MCAs authorize them to do it on your behalf. Those are two things that we wouldn't be here today if that ever happened. But the question is, why don't the rest of the documents satisfy the written agreement requirement? Because this Court has held since Merriman, onto general materials, through Herb Phillips, that those type of writings aren't sufficient. There's no way to reverse a district court without reversing the prior president of this court. You can't do it. Which particularly, because the only one that I know that says that there is a question there, or the contribution, the remittance reports, which say that that combined with other contractual information is sufficient. So what is it that would say? So your position would be if you didn't sign the CBA or an assent, you could sign 1,000 contracts and it just doesn't matter. That's not my position. That's what the Court said. Can I shift gears on you just a little bit? You know, it's always kind of interesting to look at the underlying motivations of the parties. And I don't know if I've been trying to think what B&B might have been up to and tell me if this theory, I mean, it isn't really necessary to the case, but it helps to understand what's going on. B&B really didn't want to be bound by collective bargaining agreement, nor did it want to be bound by something MCA did on its behalf. On the other hand, it wanted to employ union members, employees, as well as non-union. And so, therefore, it did what the union, it signed the documents that the union said it had to in order to do that. And the union didn't require a signature on either the collective bargaining agreement nor what interest would the union have had in the agreement between B&B and MCA. Am I just speculating, or is that a pretty fair guess as to what happened here? Actually, I think it's supported by the evidence, the undisputed evidence. That's exactly what happened here. And from a practical reason, the E&S agreements gave B&B a shot to be competitive. And? And it didn't bind them to the CBA. And in the wash, so to speak, the union benefited some from that, and B&B may or may not have ultimately benefited from it, depending on how the litigation comes out. Is that right? That's correct. I'm out of time, but I would just, in response to Judge Stranch's question, as recently as 1997, this court held in Northwest Construction that an employer's intent to be bound by the benefits fund provisions of a collective bargaining agreement cannot be inferred when the employer has not signed a collective bargaining agreement. That's what this court said. And I understand there is also precedent that says that can be met if someone else signs it on the employer's behalf. I understand that, but that didn't happen here either. Or if other documents. There's also precedent that says if other documents are signed. If it's an agreement, not other documents. In fact, General Materials stands for the exact opposite. That signing these certification clauses doesn't mean anything from a legal point of view. That's what General Materials held. So with all respect, I'm out of time. Thank you very much for listening to me. Okay, Mr. Plinant. Thank you. Mr. Malin. Counsel mentioned this court's decision in Northwest Construction. And Northwest Construction opinion has very good discussion about how that employer, in that case, reaped the benefits of union affiliation while disclaiming any obligation of the trust fund. That's exactly what happened here. Mr. Kenney and Mr. Williams, the owners of B&B, were long-time card-carrying, dues-paying members of local union 392. They knew exactly what they were doing when they started this company. What interest does the union have? I mean, why would the union be accepting payments from B&B when it's not entirely clear that B&B is anything other than a volunteer? Why wouldn't, as the union is requiring payments, why wouldn't the union also require documentation? Your Honor, I can tell you there was no intent on the part of the union to accept illegal payments in this case. Well, I know, but I mean, you know, arguing that B&B was doing something illegal while, in fact, the union may have been doing something illegal, and while B&B may or may not be sophisticated, the union surely is. So why wouldn't the union want to dot its I's and cross its T's to make sure that these payments were not – I mean, clearly there's motivation for a company to make the payments even absent a binding agreement. My response would be the union has multiple employers that it's overseeing that are members and party to the collective bargaining agreements. The employer, in this case – So the union didn't dot its I's and cross its T's. At worst, Your Honor, this is a case of sloppy record-keeping. I agree. However, the employer – Was this issue – I understood you earlier to say that the issue of no signed collective bargaining agreement was not raised in the initial answer, but was raised subsequently when it turned out that the union could not produce it in discovery? It came about during discovery, late in discovery, probably about a month or so before the close of discovery. That's the first time there was any ever defense raised about that we weren't signatory, we were never bound in the first place. I'd finally just draw this Court's attention to its recent opinions, very recent opinions, in G&W Construction and Skassa Asphalt, in which the Court, in its opinion, held that the trust funds here – this is really a case brought by the trust funds, not by the union. The union is a party plaintiff appellant, but this is really a case about the trust fund under Section 302, whether or not those contributions were legal under that section. In those opinions, the Court held that the funds are in a special position and disregarded several affirmative employer defenses. We would argue that that same logic should apply in this case, based on B&B's conduct. Thank you, Your Honors. Okay, thank you, Mr. Mallon and Mr. Cornett, for your arguments today. The case will be submitted, and we'll call the next case.